Case 3:22-cr-00008-NKM-JCH Document 55-2 Filed 10/17/22 Page 1 of 18 Pageid#: 91

Wright v. United States, Not Reported in Fed. Supp. (2017)

2017 WL 3142041
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Alexis L. WRIGHT, as the administrator of the estate of James A. Wright, Plaintiff,

v.

UNITED STATES of America, Defendant.

No 13-CV-1379 (JFB) (SIL)
|
Signed 07/24/2017

**Attorneys and Law Firms**

Joseph Miklos, Robert A. Miklos, and Daniel Patrick Miklos of Silberstein, Awad & Miklos, P.C., 600 Old Country Road, Suite 412, Garden City, New York 11530, for Plaintiff.

Vincent Lipari of the United States Attorney's Office for the Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722, for Defendant.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, United States District Judge

\*1 On March 15, 2013, decedent plaintiff James A. Wright [1] ("Wright") filed this negligence action against the United States of America (the "government" or "defendant") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 (the "FTCA"). Plaintiff alleges that the government is liable under the FTCA for injuries arising from an **ankle** bracelet that was placed and maintained on Wright's right leg and/or **ankle** by federal Probation Officer John Danielo ("Danielo") from April to October 2010. Plaintiff asserts that the negligent placement and maintenance of the bracelet—notwithstanding Wright's extensive medical history (including diabetes, peripheral neuropathy, and a prior partial amputation of his left foot) and alleged complaints about irritation caused by the bracelet—resulted in, *inter alia*, months of hospitalization; debridement surgeries to remove tissue, ligaments, and bone; and an eventual below-the-knee amputation.

The Court held a four-day bench trial from December 19, 2016 through December 22, 2016 and heard summations on February 24, 2017. After carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). As discussed in detail *infra*, the Court determines that plaintiff has failed to prove by a preponderance of the evidence that the government was negligent in placing or maintaining the **ankle** bracelet on Wright's right **ankle**.

*First*, even though Wright had a partial left-foot amputation from diabetes, Danielo was not negligent in his decision to place an **ankle** bracelet on Wright's right leg on April 13, 2010, pursuant to the electronic **monitoring** ordered by the court as part of his sentence of home confinement. It is uncontroverted that: (1) even though Wright's medical situation was fully known at the time of his sentencing on March 3, 2010, neither Wright nor his attorney raised any objection to the electronic **monitoring** at the sentencing when it was imposed by the court; (2) neither Wright nor his fiancée raised any objection to Danielo when he actually installed the bracelet on Wright's leg at his home on April 13, 2010; and (3) Wright visited his podiatrist on April 19, 2010 (six days after the installation of the device), and neither Wright nor anyone else told Danielo that his doctor had any concerns about the use of that device on his leg. Although plaintiff's expert suggested that it is "common knowledge" that this device would cause a problem to the skin of a diabetic, the Court finds that conclusory opinion to be entirely unpersuasive in



DEFENDANT'S EXHIBIT 1  3:22CR8

Case 3:22-cr-00008-NKM-JCH Document 55-2 Filed 10/17/22 Page 2 of 18 Pageid#: 92

Wright v. United States, Not Reported in Fed. Supp. (2017)

light of the lack evidence to support it (and the contrary evidence in this case—namely, the lack of any expressed concern by plaintiff, his lawyer, his doctor, or anyone else to Danielo when the device was put on his leg). Instead, the Court concludes, under the circumstances of this case, that Danielo had no reason to believe that Wright was medically unsuitable for an ankle bracelet and was not negligent in deciding to install the device on April 13, 2010 on the right ankle/leg pursuant to the court order for electronic monitoring.

**\*2** *Second*, Danielo was not negligent in sizing the ankle bracelet by using the width of his finger to measure the distance between the bracelet and Wright's skin, which was presumably greater than the quarter-inch size discussed in the manufacturer's user manual. As is abundantly clear from the manufacturer's manual, the instruction that the transmitter should be "no more than one-fourth of an inch away from the client's ankle" is to ensure that the bracelet is in close enough proximity to the ankle for the signal to work, rather than to prevent an unspecified injury from a more loosely-fitted bracelet. There is no suggestion whatsoever in the manual that a loosely-fitted bracelet could cause injury, nor is there any suggestion that the device should not be used by diabetics. In short, there is absolutely nothing in the manufacturer's manual that would have put Danielo on notice that any injury could result from his method of fitting the bracelet on any person, including a diabetic person. In addition, Danielo had used this sizing method for over a decade without incident. Moreover, neither Wright nor anyone else told Danielo, when he fitted the bracelet in this manner on April 13, 2010, that the bracelet was too loose and/or would irritate Wright's skin. In fact, as noted above, Wright's scheduled visit to his podiatrist took place within six days of the fitting of the device, and there is no evidence that the podiatrist or Wright advised Danielo after that visit that there were any medical issues with the bracelet, including its sizing.

*Third*, to the extent that Wright and his fiancée testified that Wright first complained to Danielo in August or September 2010 about discomfort to his leg caused by the bracelet, the Court finds that testimony not to be credible in light of all the evidence in the record and the Court's evaluation of the credibility of the witnesses, including their demeanor. As a threshold matter, Wright never sought any medical treatment for any alleged irritation to his skin prior to October 2010. In any event, even assuming *arguendo* that the discomfort to the right leg/ankle began in August/September 2010, the Court finds that such irritation to the skin was never mentioned to Danielo prior to October 12, 2010. Moreover, the Court concludes that Danielo had no duty to conduct a medical exam of Wright during his home visits to inspect for such irritation or to take any other affirmative actions in the absence of such a complaint from Wright, or someone on Wright's behalf, during the period from April 13, 2010 until October 12, 2010.

*Finally*, Danielo was not negligent in his response to the events of October 12, 2010 at Wright's residence. Specifically, although Danielo saw the cut on Wright's ankle on that date during the home visit, Wright told Danielo that he was going to have the cut examined by his doctor later that day. Under those particular factual circumstances (which are uncontroverted), it was not negligent for Danielo to fail to remove the bracelet immediately (or to immediately inform the court or his supervisor of the problem), nor was it negligent for Danielo to move the bracelet up and tighten it slightly to keep it away from the cut for a few hours until the doctor could determine whether the bracelet was causing the cut and, if so, whether the bracelet needed to be removed. In fact, Danielo instructed Wright to report the doctor's assessment to him, and Danielo said that he would do whatever was in Wright's best interest medically going forward. There is no evidence that, when Wright's doctor examined Wright later on that date and prescribed oral antibiotics for the cut, that he suggested that the bracelet needed to be removed to prevent further injury. In fact, plaintiff's medical expert at trial testified that, if the bracelet had been removed after the doctor visit, the later injuries (which are the subject of this lawsuit) would not have occurred. In any event, it is undisputed that neither Wright nor his doctor ever contacted Danielo following the office visit to advise Danielo that the device needed to be removed for medical reasons. Moreover, the Court concludes that Danielo had no affirmative duty to follow up with Wright or his doctor to confirm that the bracelet did not need to be removed. In light of the prior conversation and the circumstances, it was entirely reasonable for Danielo to expect that Wright would certainly contact him after the doctor visit if the doctor believed that the device was causing the cut and needed to be removed for medical reasons. In fact, Wright contacted the Probation Department on October 15, 2010 (three days after his visit to the doctor) to request permission to leave his home to meet with his attorney and, even though he was on the telephone with the Probation Department, there is no evidence that he mentioned any ongoing medical issues with the bracelet. Given these facts on October 12, 2010, including that Wright was about to see a doctor regarding the

Case 3:22-cr-00008-NKM-JCH  Document 55-2  Filed 10/17/22  Page 3 of 18  Pageid#: 93

Wright v. United States, Not Reported in Fed. Supp. (2017)

cut in a few hours and Danielo reasonably expected to hear back from Wright if the bracelet was causing the irritation and needed to be removed, Danielo's actions that day, and any subsequent failure to affirmatively follow-up with Wright or his doctor, were not negligent.

**\*3** Accordingly, for these reasons and those that follow, the government is not liable to plaintiff under the FTCA, and plaintiff is not entitled to any damages.

I. BACKGROUND

Plaintiff commenced this action on March 15, 2013. (ECF No. 1.) On December 4, 2014, plaintiff moved for summary judgment (ECF No. 33), and the following day, the government cross-moved to dismiss for lack of subject matter jurisdiction and for summary judgment (ECF No. 35). Wright died in February 2015, and his daughter Alexis Wright was thereafter appointed as administrator of his estate and substituted as plaintiff. (*See* ECF No. 54.) On May 29, 2015, plaintiff filed an amended complaint together with a renewed motion for summary judgment. (ECF Nos. 55-56.) On June 1, 2015, the government renewed its cross-motion to dismiss and for summary judgment. (ECF No. 57.)

By Memorandum and Order dated February 11, 2016, the Court denied both parties' motions. See *Wright v. United States*, 162 F. Supp. 3d 118 (E.D.N.Y. 2016). As a threshold matter, the Court rejected the government's argument that it was entitled to absolute immunity from liability on plaintiff's negligence claim on the ground that Danielo placed the ankle bracelet on Wright pursuant to an order by United States District Judge Feuerstein. *Id.* at 121. Because "Judge Feuerstein simply ordered home detention with electronic monitoring [and] gave no direction regarding the manner of such monitoring," the Court determined that "any negligence in the application or maintenance of the ankle bracelet by the Probation Department [was] not protected by absolute immunity." *Id.* With respect to the ultimate issue of negligence, the Court found that neither party was entitled to summary judgment because of disputed issues of material fact pertaining to, among other things, Wright's claims that (1) he complained to Danielo in August 2010 about a rash and irritation on his right ankle prior to his hospitalization in October 2010 for an infection to that ankle; and (2) after Wright showed Danielo a cut on his ankle on October 12, 2010, Danielo moved the bracelet away from the cut and tightened it so that it would not slide down, rather than removing the bracelet or seeking some modification of the monitoring conditions from the court. *Id.* at 121-22. Finally, the Court determined that, even if plaintiff had adduced sufficient evidence of the government's negligence, there were also disputed issues of comparative negligence that could not be resolved at the summary judgment stage. *Id.* at 122.

Thereafter, in advance of trial, plaintiff submitted proposed findings of fact and conclusions of law on December 9, 2016 (ECF No. 68); the government did the same on December 12, 2016 (ECF No. 69); and plaintiff filed supplemental proposed findings on December 13, 2016 (ECF No. 74). The Court held a bench trial from December 19, 2016 through December 22, 2016. (ECF Nos. 76-79.) Plaintiff presented the testimony of two expert witnesses—Dr. Elizabeth Harrington ("Dr. Harrington"), a vascular surgeon; and Robert Thornton ("Thornton"), a former federal probation officer—and the testimony of Dorothy Sprague ("Sprague"), who was engaged to Wright prior to his death. In addition, plaintiff played a video recording of Wright's deposition. The government called Danielo to testify as its sole witness.

**\*4** After the bench trial concluded, the Court granted the parties the opportunity to submit revised proposed findings of fact in light of the evidence introduced at trial. Plaintiff submitted proposed findings of fact on February 10, 2017 (ECF No. 82), and the government filed its proposed findings on February 13, 2017 (ECF 85). The Court subsequently heard summations from counsel on February 24, 2017. (ECF No. 87.)

The Court has fully considered all of the evidence presented by the parties, as well as their written submissions. Below are the Court's findings of fact and conclusions of law.

Case 3:22-cr-00008-NKM-JCH Document 55-2 Filed 10/17/22 Page 4 of 18 Pageid#: 94

Wright v. United States, Not Reported in Fed. Supp. (2017)

## II. FINDINGS OF FACT

The following section constitutes the Court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1).[2] They are drawn from witness testimony and the parties' trial exhibits. In general, having considered all of the evidence (including the credibility of the witnesses), the Court found Danielo's testimony to be entirely credible, but found, as discussed *infra*, that certain portions of Wright's deposition testimony were not credible. Moreover, as discussed *infra*, the Court did not find Thornton's expert opinions to be persuasive after carefully considering them in light of all the evidence. Because the Court concludes that the government is not liable to plaintiff, the Court will only briefly summarize those findings of fact that pertain to the issue of damages.

A. Witness Background

1. Dr. Harrington

Dr. Elizabeth Harrington is a vascular surgeon licensed to practice medicine in New York State, as well as a Clinical Associate Professor of Surgery at Mt. Sinai Hospital. (Tr. at 36, 38.)[3] She graduated from New York Medical College in 1975 and has been a practicing surgeon since finishing a five-year residency and a one-year fellowship in 1981. (*Id.* at 37.) Dr. Harrington has experience treating patients with diabetes, an illness that can exacerbate vascular and cardiovascular diseases. (*Id.* at 41.)

2. Thornton

Robert Thornton is a retired United States Probation Officer who was employed by the Probation Department for over 27 years. (Tr. at 176.) During his time as a Probation Officer, he worked in the Northern District of Georgia and the Western District of Washington. (*Id.* at 177-78.) Thornton's experience includes presentence investigation, supervision, pretrial services, and pretrial service investigations. (*Id.* at 177-79.) He held the titles of Probation Officer, Senior Probation Officer, and Supervising Probation Officer before retiring. (*Id.* at 179-180.) Thornton has experience with location monitoring, electronic monitoring, and voice verification supervision as part of conditions of probation. (*Id.* at 181-86.) However, he has never personally placed an electronic bracelet on an offender. (*Id.* at 184, 298.)

3. Sprague

Dorothy Sprague met James Wright approximately 26 or 27 years ago and was engaged to him prior to his death. (*Id.* at 34, 335.) She and Wright had one son named Connor, and she currently works as a receptionist for Lexus luxury cars. (*Id.* at 335-36.)

4. Wright

James Wright was born in 1948 and resided with his fiancée Sprague and their son Connor before his death. (Wright Dep. Tr. at 5-6.)[4] He also had a daughter named Alexis from a prior marriage. (Tr. at 335.) Wright obtained a master's degree in education from New York University and worked for the William Floyd School District prior to his retirement in 2005. (Wright Dep. Tr. at 11-12.) He died on February 2, 2015. (Tr. at 353.)

5. Danielo

**\*5** John Danielo began his employment with the United States Probation Department for the Eastern District of New York in 1991. (*Id.* at 402.) He worked at the Probation Department's office in the Brooklyn federal district court from May 1991 to May 1992. (*Id.* at 403-04.) Initially, his duties consisted of writing presentence reports. (*Id.* at 404-05.) After the latter part of 1992, he had no further involvement in writing presentence reports, (*Id.* at 413.)

In May 1992, Danielo transferred to the Probation Department's Long Island office. (*Id.* at 404-05.) From the end of 1992 until May 1995, he supervised a caseload of offenders. (*Id.* at 405.) For the next 19 years, from May 1995 until his retirement from the Probation Department in June 2013, Danielo was the sole location monitoring specialist for all of Nassau and Suffolk Counties and, for a time, part of eastern Queens County. (*Id.* at 406, 415.) He enforced and supervised compliance with court orders for probation and home confinement, including restitution. (*Id.* at 408-09.) During that period, Danielo had on average 100 cases a year—30 or 40 at any particular time—for an approximate total of 2,000 cases over the course of his career. (*Id.* at 407.)

In most of the cases that Danielo supervised, the court had ordered home confinement with electronic monitoring for the offender. (*Id.*) During Danielo's employment with the Probation Department, all electronic home monitoring in the Eastern District of New York was done with electronic ankle bracelets; the Probation Department did not use electronic wrist bracelets. (*Id.*) In addition to electronic monitoring, other methods of location monitoring include voice verification, which employs computer-generated telephone calls to the offender's home made at random; and GPS, which uses satellite tracking of an offender's movements outside of the home. (*Id.* at 411-12.)

B. The Criminal Case
On April 11, 2008, the government filed a criminal information in *United States v. Wright*, 08-CR-231 (SJF), charging Wright with filing a false federal tax return for the year 2002, which understated his income as $127,525, when it exceeded $407,023; and the tax due as $31,898, when it exceeded $154,688. (Def.'s Exh. ("DX") A.)[5] On June 20, 2008, Wright signed a plea agreement in the criminal case whereby he waived indictment and agreed to plead guilty to tax evasion, in violation of 28 U.S.C. § 7201. (DX B.)[6] That same day, he pled guilty, and Judge Feuerstein accepted his plea to the tax evasion charge. (DX C.)

United States Probation Officer Steven Guttman prepared, and supervising Probation Officer Carmen Leichtle approved, a presentence investigation report ("PSR"), dated November 13, 2008 that noted Wright's medical history, including his diabetes illness, hospitalizations, and medications. (Pl.'s Exh. ("PX") 2 at 18-21.) That same day, the Probation Department issued a Sentence Recommendation that recommended, *inter alia*, a sentence of three years' probation with 12 months of electronic home confinement. (DX E.)[7] The Sentence Recommendation noted Wright's medical ailments, including diabetes, and stated that the deterioration in his physical condition over the preceding two to three years supported a non-custodial sentence. (*Id.* at 2.) On October 22, 2009, the Probation Department issued a second addendum to the PSR, which noted that Wright underwent a partial amputation of his left foot due to complications from diabetes during the summer of 2009. (PX 2 at 39-42.)

\*6  On March 3, 2010, Judge Feuerstein sentenced Wright to three years' probation, with the first 12 months to be served under home detention with electronic monitoring (DX I), and the court entered a judgment of criminal conviction that reflected that sentence on March 18, 2010 (DX J).

C. Practices and Polices for Electronic Monitoring
The electronic ankle bracelets used in the Eastern District of New York from April to October 2010 were made by a company named BI, which also prepared a BI HomeGuard Series User Guide (the "BI User Guide"). (Tr. at 213; PX 3.) The BI User Guide instructs that after the bracelet strap is fastened, the transmitter portion of the electronic bracelet should be no more than one-quarter inch from the ankle; the transmitter can rotate around the ankle with resistance in the front and back; and the transmitter should feel comfortable to the offender while walking so that the offender's ankle does not feel pinched. (Tr. at 215-16; PX 3 at 26.) The BI User Guide explains that improper installation or a poor fit may result in false alerts. (PX 3 at 30.) In addition, in the "Frequently Asked Questions" Appendix, the BI User Guide further explains how a loose-fitting bracelet can result in a false alert:

> Can the transmitter be installed a little loose to allow room for leg swelling?
>
> No. If the transmitter is not appropriately sized to the client's ankle it sends a false tamper message to the central monitoring computer. The transmitter has built-in sensors that detect whether or not it is properly placed against the client's ankle.

Case 3:22-cr-00008-NKM-JCH Document 55-2 Filed 10/17/22 Page 6 of 18 Pageid#: 96

Wright v. United States, Not Reported in Fed. Supp. (2017)

(Tr. at 217, 299-300; PX 3 at 78.) At no point in the **BI** User Guide is there any warning that the electronic bracelet is medically unsuitable for certain individuals, such as individuals with severe diabetic conditions, or that a loosely-fitted bracelet could cause any injury.

The Eastern District of New York Location **Monitoring** Manual (the "EDNY Manual") also addresses sizing of **BI** electronic **ankle** bracelets. (PX 1 at 44-45.) It states that (1) the distance between the bracelet strap and the offender's skin must not exceed three-eighths of an inch, and a finger must fit snugly in between; (2) the transmitter can rotate from one side of the **ankle** to the other but not easily; and (3) when walking, the bracelet should not pinch the offender's **ankle**. (*Id.* at 45.) The EDNY Manual further states that the probation officer must install the transmitter "following the contractor's [**BI's**] instructions ... Upon installation, [**BI**] is required to notify the assigned officer, via pager of a 'successful installation.' " (*Id.* at 44.) With respect to physical health problems, the EDNY Manual states:

> Offenders with persistent or chronic health problems should not be automatically denied participation in Location **Monitoring**. The officer must assess the offender's ability to meet the requirements of Location **Monitoring** and whether the frequency and type of medical treatment they require is inconsistent with participation in Location **Monitoring**. However, *it is specifically noted that the equipment provider has recommended that individuals with pacemakers should not be fitted with the ankle radio transmitter*. In addition, consultation with the equipment provider is required in cases of *pregnant offenders who may be undergoing ultrasound examination, and any individuals requiring an MRI or CAT scan examination*.

\*7 (PX 1 at 31 (emphasis in original).) The EDNY Manual makes no reference to any concerns about utilizing the **ankle** bracelet on offenders with a severe diabetic condition.

D. Placement of **Ankle** Bracelet on Wright
Danielo was not involved in drafting the Probation Department's PSR. (Tr. at 412-413.) He was assigned to supervise Wright's home detention with electronic **monitoring** after Judge Feuerstein sentenced Wright to home confinement with electronic **monitoring** on March 3, 2010. (*Id.* at 420; DX K at 38-39.)

An electronic **ankle** bracelet consists of a rubber strap and a transmitter. (Tr. at 435.) The strap has a rail that slides and is screwed into both sides of the transmitter. (*Id.*; *see also* PX 3 at 21.) To properly function, the electronic bracelet must be fitted so that the transmitter is close enough to the skin to send a signal, but not too loose, or it will send a false tamper alert. (Tr. at 435-38, 467-468.)

Danielo was trained by his predecessor, through on-site observation and hands-on experience, to apply an electronic bracelet on an offender's **ankle** using the "one-finger rule." (*Id.* at 436-37.) That is, after fitting the bracelet on the **ankle**, but before sealing it, Danielo's practice was to insert the bottom tip of his index finger into the bracelet to ensure that the transmitter was close enough to the skin to avoid a false tamper alert. (*Id.* at 436, 513.) The bracelet was supposed to have some "play" so that it could slide from the top of the **ankle** to the bottom of the calf and rotate around the **ankle** with some resistance. (*Id.* at 437-38, 520-21.) It was also Danielo's practice that after fitting, but before sealing, the bracelet, he would always ask the offender if the bracelet was comfortable, and, depending on the response, he would adjust it if necessary. (*Id.* at 438-39.) If the offender complained about the bracelet, Danielo's practice was to re-adjust it to make it tighter or looser. (*Id.* at 439.) Over the course of his 19-year career as a location **monitoring** specialist, Danielo never received a complaint, other than in the instant case, that an electronic **ankle** bracelet had caused an injury; instead, he only had complaints of a minor irritation caused by a bracelet on one or two occasions. (*Id.* at 440, 473.)

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 7 of 18   Pageid#: 97

Wright v. United States, Not Reported in Fed. Supp. (2017)

On March 22, 2010, Probation Officer Danielo first met Wright in the Probation Department's offices in the Central Islip federal courthouse. (*Id.* at 422; DX K at 37-38.) He reviewed the conditions of the electronic home monitoring program with Wright, told him that an electronic bracelet would be put on his ankle, and explained how the bracelet would work. (Tr. at 427-28.) Danielo testified that Wright did not object to wearing the bracelet, nor did he indicate that there would be any problem with wearing an electronic bracelet on his ankle. (*Id.* at 427-28.)

After Danielo reviewed the conditions of the electronic home monitoring program with Wright, they both signed a Home Confinement Program Participant Agreement. (Tr. at 429-31; DX K at 38; DX L.) The agreement provided that "[w]hile in the home confinement program [Wright] agree[d] to wear a non-removable ankle bracelet that w[ould] be attached by [his] officer." (DX L at ¶ 8.) Wright testified that he did not recall objecting to this provision at the time he signed the agreement. (Wright Dep. Tr. at 49-50.) In addition, Wright agreed "not to remove or tamper with the ankle bracelet (transmitter) except in a life threatening situation or with the prior permission of [his] officer," and "to allow authorized personnel to inspect and maintain the ankle transmitter and receiver/dialer." (DX L at ¶¶ 13-14.) Wright testified that he understood that the electronic ankle bracelet "was part of the sentence," and that Danielo was following a court order when he placed the electronic bracelet on Wright's ankle. (Wright Dep. Tr. at 40-41.)

**\*8** On April 13, 2010, Danielo went to Wright and Sprague's residence to install the electronic monitoring equipment and to place the electronic bracelet on Wright's ankle. (Tr. at 433-41; DX K at 36.) Danielo first intended to place the bracelet on Wright's left ankle but, due to Wright's partial left foot amputation, he instead placed the bracelet on the right ankle, which was a "normal" ankle. (Tr. at 503-04, 507-08.) It was Danielo's ordinary practice to read a PSR and any addenda thereto before meeting with an offender under his supervision; however, he could not recall at trial whether he had read the second addendum to Wright's PSR noting the amputation prior to April 13, 2010. (*Id.* at 502-07.) Despite observing the partial amputation of Wright's left foot, Danielo did not have any concerns about placing the electronic monitoring bracelet on Wright's right ankle, and he did not ask Wright about the amputation or notify the court or his supervisors in the Probation Department of the amputation. (*Id.* at 507-08.) Wright testified that he did not object to placement of the bracelet on his right ankle or complain that it was either too tight or too loose. (Wright Dep. Tr. at 58-60.) After Danielo installed the electronic bracelet, BI sent a notice of a successful installation. (PX 2 at 256.)

Thornton testified that, in his opinion, Danielo was negligent and should have realized that Wright was not a suitable candidate for an electronic bracelet when he saw Wright's partial left foot amputation because

> it is common knowledge that with somebody that ha[d] diabetes as bad as Mr. Wright had, that the neuropathy that goes along with that, 1, can damage the nerves so that the person really can't feel pain and then, 2, what may be normal or not cause any type of rash or rub or damage on a person without diabetes could certainly cause an ulcer, rubbing, sore, and subsequently infection with somebody that has Type 2 diabetes as bad as Mr. Wright had.

(Tr. at 228-29.) The Court questioned Thornton as to whether it is "common knowledge that a loosely fitted bracelet on a person with diabetes can exacerbate the diabetes [and] is a medical problem ... that it is common knowledge that a diabetic skin is more vulnerable to irritation than a healthy person's skin[?]" (*Id.* at 329-30.) Thornton responded that is common knowledge that diabetes "affect[s] the lower limbs" and that the weight of the bracelet could accordingly irritate a diabetic's skin. (*Id.* at 330-31.) As discussed *infra*, the Court does not find this conclusory opinion to be persuasive.

In addition, Thornton testified that, in his opinion, Danielo was negligent in using the "one-finger rule" to determine the proper distance between Wright's skin and the ankle bracelet, and that Danielo should have followed BI's instructions and used a quarter-inch sizing. (*Id.* at 229-30.) He also said that the three-eighths of an inch sizing recommended by the EDNY Manual would result in a looser ankle bracelet that could result in false signals and abrasions to the offender's ankle. (*Id.* at 219-20.)

Case 3:22-cr-00008-NKM-JCH Document 55-2 Filed 10/17/22 Page 8 of 18 Pageid#: 98

Wright v. United States, Not Reported in Fed. Supp. (2017)

Thornton said that a probation officer could use a ruler to gauge the proper distance between the offender's skin and the ankle bracelet, but he acknowledged that "generally, it is not a common practice [to use a ruler] after the person has done it for a period of time." (*Id.* at 301.) Danielo testified that he helped to draft the EDNY Manual and acknowledged that it allowed for looser sizing than the BI User Guide. (*Id.* at 511-12.) The Probation Department did not consult with any doctors or BI when drafting the EDNY Manual. (*Id.* at 517-18.) Danielo also allowed his finger to be measured at trial and admitted that its width exceed a quarter-inch, though that measurement was not precise. (*Id.* at 512-15.)

Dr. Harrington testified that, in her opinion, Wright was a poor candidate for electronic monitoring on his leg. (*Id.* at 49-51.) This was because he had peripheral neuropathy, which means that he did not have feeling in his foot, and thus could not sense the bracelet riding up and down his leg and know whether it was irritating his skin or causing a problem. (*Id.* at 50.) Dr. Harrington further testified that Wright had problems with his memory and could not visually inspect himself and take care of the bracelet. (*Id.* at 50-51.) She also testified that, in her opinion, the manner in which the ankle bracelet was placed on Wright's leg caused his injury because "[h]e had peripheral neuropathy. His skin was not the same as another individual. He already had an amputation of his forefoot on the other side ... [T]he fact that this bracelet rode up and down and was loose caused him the irritation, subsequent ulcer, and all the subsequent problems that ensued." (*Id.* at 58-59.)

*9 As discussed in detail *infra*, even if Wright may have been a poor candidate for electronic monitoring due to his medical condition, the Court does not find Danielo to be negligent (1) in failing to recognize that issue on his own at the time he installed the device, or (2) in how he installed the bracelet on Wright's leg. In reaching this conclusion, the Court has carefully analyzed, *inter alia*, Thornton's opinions and finds them unpersuasive in this particular case in light of all the evidence.

E. Supervision of Wright from April to October 2010
Federal probation officers are required to keep a computerized chronology documenting their supervision of an offender, and that chronology must include a record of each contact with the offender. (Tr. at 417-20.) Danielo kept such a chronology of his supervision of Wright that recorded all of his interactions with Wright, and either he or his administrative assistant Lolita Brown made the appropriate entries. (*Id.* at 418-19; DX K.)

After placing the bracelet on Wright's ankle on April 13, 2010, Danielo personally visited Wright at his residence on five occasions selected at random and unannounced in advance: April 30, June 16, July 8, September 9, and October 12, 2010. (*Id.* at 530.) Danielo made entries to his chronology describing those visits. (DX K at 23, 30, 31, 33.) In the interim, he also had telephone contacts with Wright. (*E.g.*, Tr. at 540.)

Danielo's practice during visits to Wright's residence was to inspect the premises, discuss issues relating to probation, and check the monitoring unit and electronic bracelet to ensure that they were functioning properly and were not tampered with. (*Id.* at 448.) He would also ask Wright to lift his pant leg so that he could see the ankle bracelet. (*Id.*) During Wright's home confinement, from April to October 2010, there was no indication that Wright or anyone else had tampered with the monitoring equipment or the electronic bracelet. (*Id.* at 467-68.) Moreover, Danielo never received an alert indicating that the bracelet was too loose on Wright's ankle. (*Id.* at 468.)

Danielo credibly testified that, prior to October 12, 2010, neither Wright nor anyone on his behalf ever complained to Danielo, during any of those home visits or telephone calls, about the ankle bracelet. (*Id.* at 446-448; 465-67.) He further testified, in a credible manner, that his chronology would have reflected any such complaints, and there are no chronology entries that indicate that Wright complained about the ankle bracelet prior to October 12, 2010.[8] (Tr. at 465; DX K at 23-40.)

Wright testified, however, that he first felt discomfort in his ankle around August 2010 when his ankle became "irritated" because the bracelet rubbed and chafed against it. (Wright Dep. Tr. at 68-69.) He testified that, at that time, there was no cut or infection on his ankle. (*Id.* at 71.) He also said that he complained to Danielo "a couple of times" but not to anyone else because Danielo "was God." (*Id.* at 69-70.) Similarly, Sprague testified that Wright's leg became irritated in August or September 2010

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 9 of 18   Pageid#: 99

Wright v. United States, Not Reported in Fed. Supp. (2017)

and that Wright complained to Danielo, but Danielo did not do anything in response.[9] (Tr. at 339-40.) The Court does not find either Wright's or Sprague's testimony to be credible and, instead, finds that Danielo was unaware of any issues regarding the use of the ankle bracelet until October 12, 2010.

*10 The chronology also does not reflect, and Sprague did not assert, that Danielo ever denied Wright a request to leave his residence to seek medical treatment or for daily needs and activities, known as "one-timers." (Id. at 306-307, 366, 446.) In supervising an offender, a probation officer can program the monitoring equipment to permit one-time, or temporary, schedules allowing the offender to leave his residence for a particular purpose at a particular time, such as religious observation, shopping, or a medical appointment. (Id. at 413-15.) For instance, from April 15 to July 31, 2010, Wright requested and received leave from home confinement on 33 days to, among other things, attend his son's baseball games, visit his future sister-in-law, pick up prescriptions, grocery shop, run errands, and tend to another property of his in anticipation of a sale. (Id. at 441-62; DX K at 29-36.)

On April 19, 2010, after the electronic ankle bracelet had been attached, Wright received leave to visit his podiatrist, Dr. Furst. (Tr. at 442; DX K at 35-36.) Dr. Harrington testified that Dr. Furst was aware from the course of his treatment that Wright was diabetic. (Tr. at 147-48, 150-52.) Dr. Furst did not contact Danielo or anyone at the Probation Department to complain or otherwise advise that it was improper or unsafe for Wright to wear an ankle bracelet. (Id. at 152, 442.) From April to October 2010, there was no medical record indicating that Wright sought any treatment for injury caused by the ankle bracelet or that a doctor spoke to the Probation Department on Wright's behalf. (Id. at 152.) Wright also testified that he never sought medical treatment for irritation or injury caused by the ankle bracelet during this period, even after the bracelet allegedly began to chafe his skin in August 2010. (Wright Dep. Tr. at 63-70.) Moreover, in light of the Court's evaluation of all of the evidence (including the credibility of the witnesses), the Court does not find credible Wright's testimony that Danielo told him that he could not leave his home to attend medical appointments. (Id. at 74-75.)

F. October 12, 2010 Visit
Sprague testified that she first noticed a problem with Wright's right ankle on October 8, 2010. (Tr. at 368-69.) Sprague told Wright to see a doctor for his ankle, but Wright refused because he had no medical coverage. (Id. at 376.) After Sprague had seen redness on Wright's ankle, she observed that it "seemed to have gotten worse, almost like in a matter of 24 to 48 hours." (Id. at 374.) She and Wright first realized the severity of the condition of the right ankle on October 12, 2010, when they saw an open wound. (Id. at 369, 371, 374.)

Before Danielo made a random home visit that day, Wright had already made an appointment with his long-time treating physician Dr. Alan Lucks for later in the afternoon. (Id. at 374, 471-72.) At the time, Dr. Lucks had treated Wright continuously for 21 years, since 1989, including for his diabetes. (See PX 6 at 114-53.) Danielo credibly testified that he was unaware of any discomfort on Wright's ankle from the electronic bracelet prior to that visit, when Wright showed Danielo a cut on his ankle that had become infected, according to Wright, due to irritation from the rubbing of the ankle bracelet. (Tr. at 471-72, 477, 481; DX K at 23.) This was the first time that Danielo had ever been told by an offender that an electronic bracelet caused a cut or an infection. (Tr. at 473.)

Danielo also credibly testified that he told Wright and Sprague, who was present during the October 12, 2010 visit, that Wright "should go to the doctor and report back to [Danielo] and whatever the doctor said and that [Danielo] would do whatever is necessary in [Wright's] best interest medically to go forward." (Id. at 472, 474; DX K at 23.) Danielo also moved the bracelet away from the cut up Wright's leg; tightened it one notch (allowing it to still move up and down and rotate around the ankle) so that the bracelet would not slide down to the cut; and told Wright to put a band or a sock around the bracelet to hold it in place off of the cut until Wright visited Dr. Lucks. (Tr. at 472, 474-75; DX K at 23.)

*11 At trial, Danielo further testified that he did not consider cutting off the ankle bracelet at that time and provided the following rationale:

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 10 of 18   Pageid#: 100

Wright v. United States, Not Reported in Fed. Supp. (2017)

It's not my job, there's a court order to be on home confinement. The only reason that we would ever cut a bracelet off would be if they were in the hospital or arrested in jail, something like that, where tests needed to be done. So there would be no reason, he was going to the doctor to see what the problem was and we were going to plan to address it. I had left it with him to give me a call.

(*Id.* at 478.) Danielo acknowledged that, even after tightening the bracelet, it still could have slid down Wright's leg and further irritated the cut. (*Id.* at 525.)

Dr. Lucks examined Wright later that day and diagnosed an "ulceration" on the **ankle** which was "stable." (*Id.* at 73.) His notes indicate that the irritation began in August 2010 (without providing the basis for that statement). (*Id.* at 64; PX 6 at 77.) Dr. Lucks prescribed oral antibiotics, and sent Wright home, and Dr. Harrington testified that, in her opinion, Dr. Lucks' treatment was appropriate because there was not, at that time, any evidence of osteomyelitis, which is an infection of the bone. (Tr. at 74-75, 169-70.) Dr. Lucks's examination notes indicate that he was not concerned that Wright's leg was tender or swollen, that there was an infection going up the leg, or that there was a systemic problem. (*Id.* at 74.) Dr. Harrington further testified that had she treated Wright on October 12, 2010, she would have recommended removal of the **ankle** bracelet, but said that there was no evidence that Dr. Lucks provided such a recommendation to Danielo. (*Id.* at 169.) She also said that, in her opinion, had the bracelet been removed on that day, Wright's subsequent hospitalizations would not have occurred. (*Id.* at 170.) Dr. Herrington further testified that, in her opinion, Danielo's actions on October 12, 2010 were "substantial factors" in aggravating the injury to Wright's **ankle**. (*Id.* at 81-83.)

Danielo credibly testified that he never received a call from Wright, Dr. Lucks, or anyone else providing medical information until October 16, 2010. (*Id.* at 478.) Neither Wright nor anyone else contradicted that credible testimony. Instead, the chronology includes an October 15, 2010 entry indicating that Wright asked for and received permission to meet with his attorney on October 18 and with Dr. Lucks on October 19, 2010. (DX K at 23.) The entry contained no indication (nor did Wright even assert) that he mentioned any ongoing issues with the bracelet during these subsequent interactions with the Probation Department.

Thornton testified that, in his opinion, Danielo was negligent in not removing the **ankle** bracelet on October 12, 2010 and exacerbated the cut on Wright's **ankle** by tightening the bracelet and telling Wright to use a band to hold it in place. (Tr. at 267-71.) In addition, Thornton said that, in his opinion, Danielo was negligent in not informing his supervisors or the court about Wright's injury, and that had he done so, the court would have modified Wright's **monitoring** conditions to voice verification. (*Id.* at 273.) As discussed in detail *infra*, the Court disagrees with Thornton's opinions that Danielo's actions on October 12, 2010 were negligent. Instead, the Court concludes that the actions were reasonable in light of the particular circumstances that he confronted, including the fact that Wright was seeing a doctor later that day, and Danielo was prepared to implement whatever modifications to the **ankle** bracelet that the doctor deemed medically necessary.

G. Wright's Hospitalization and Medical Treatment

*12 On October 16, 2010, Wright called Danielo to advise that he had checked into John Mather Memorial Hospital, and Danielo gave permission to the emergency room doctor who treated Wright to cut off the electronic bracelet. (*Id.* at 480-81; DX K at 22.) Sprague testified that the doctor stressed that there was a very serious infection to Wright's leg caused by the **ankle** bracelet, and that he was going to cut off the bracelet with or without permission. (Tr. at 343.)

Dr. Harrington testified that the emergency room records reflect that Wright's medical condition had worsened since October 12, 2016 because there was infection streaking and swollen warm central ulceration on his leg indicative of full-body sepsis. (*Id.* at 77-78.) A bone scan was performed on October 18, 2010 that yielded findings consistent with the clinical suspicion of osteomyelitis. (*Id.* at 81.) Dr. Harrington further testified that, in her opinion, Danielo's decision to tighten the bracelet on

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 11 of 18   Pageid#: 101

Wright v. United States, Not Reported in Fed. Supp. (2017)

October 12, 2010, rather than to remove it, was a substantial factor in aggravating the injury to Wright's right **ankle** and causing the resulting osteomyelitis because the bracelet continued to rub against his skin, irritate the wound, and cut off circulation to his lower leg. (*Id.* at 81-82.) While hospitalized, Wright was on antibiotics for 62 days and underwent six debridement surgeries to remove necrotic tissue. (*Id.* at 85-95, 106.) Wright reported severe pain during this period. (*Id.* at 95-102.)

On October 25 and November 1, 2010, Sprague told Danielo that he had been aware of Wright's infection before October 12, 2010. (*Id.* at 481-84; DX K at 20-21.) Danielo denied this and reiterated that he first learned of the infection on October 12, and that he had said that he would do whatever was in Wright's best interests medically regarding the bracelet. (*Id.* at 481-84; DX K at 20-21.)

Wright was again admitted into John Mather Memorial Hospital from April 25 through May 27, 2011 and from August 10 through September 1, 2011, during which time he underwent four additional surgeries. (Tr. at 103-110, 112-13.) Wright was also admitted to Stonybrook University Hospital from January 29, 2013 through March 4, 2013 and was diagnosed with bacteremia due to the chronic **ankle** infection and osteomyelitis. (*Id.* at 117-21.) As a result, he underwent two surgeries resulting in a below-the-knee amputation of his right leg, causing Wright to experience extreme pain and discomfort. (*Id.* at 123-140.) Moreover, Wright's quality of life and his relationships with Sprague and his children declined. (Tr. at 351-53; Wright Dep. Tr. at 120-24.)

H. Termination of Electronic **Monitoring**

On January 4, 2011, after Wright had been discharged from the hospital, Wright signed an agreement under which he waived his right to a hearing and to counsel and agreed to a modification of the terms of his home confinement from electronic to non-electronic home confinement. (Tr. at 484-485; DX M.) On February 9, 2011, Wright signed a Voice Verification Participant Agreement. (Tr. at 485-86; DX N.) Finally, by memorandum dated April 27, 2011, which was approved by his supervisor, Danielo petitioned the court to end Wright's home confinement. (Tr. at 487-488; DX P.) The court approved the request on May 5, 2011, and Wright's home confinement ended. (*Id.*)

### III. CONCLUSIONS OF LAW

A. Legal Standards

Plaintiff bears the burden to prove all elements of his negligence claim by a preponderance of the evidence. *See, e.g.*, *Craig Test Boring Co. v. Saudi Arabian Airlines Corp.*, 138 F. Supp. 2d 553, 557 (S.D.N.Y. 2001). "Under the FTCA, courts are bound to apply the law of the state ... where the accident occurred." *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000) (citing *Richards v. United States*, 369 U.S. 1, 10-15 (1962)). Accordingly, the Court applies New York law to assess liability in this case.

*13 The elements of a negligence claim brought under New York law are well-settled. They are as follows: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002); *see, e.g.*, *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013); *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000). Thus, a plaintiff who sues the government for negligence under the FTCA must prove, by a preponderance of the evidence, that "(1) the Government owed a duty to her; (2) the Government beached that duty by its negligent conduct; and (3) as a result of that beach, plaintiff suffered an injury." *Holland v. United States*, 918 F. Supp. 87, 89-90 (S.D.N.Y. 1996) (citing *Paulison v. Suffolk County*, 775 F. Supp. 50, 53 (E.D.N.Y. 1991); *Akins v. Glens Falls City School Dist.*, 53 N.Y.2d 325, 333 (1981)).

Even where a duty is owed to the plaintiff, "[t]he scope of the duty 'is limited to risks of harm that are reasonably foreseeable.' Foreseeability is defined by actual or constructive notice [of the particular risk of harm]." *Qin Chen v. United States*, 494

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 12 of 18   Pageid#: 102

Wright v. United States, Not Reported in Fed. Supp. (2017)

Fed.Appx. 108, 109 (2d Cir. 2012) (quoting *Sanchez v. State of N.Y.*, 99 N.Y.2d 247, 253 (2002)). However, as the New York Court of Appeals has cautioned,

> [f]oreseeability should not be confused with duty. The principle expressed in *Palsgraf v. Long Is. R.R. Co.*, 248 N.Y. 339 (1928) ... is applicable to determine the scope of duty—only after it has been determined that there is a duty.... When a duty exists, nonliability in a particular case may be justified on the basis that an injury is not foreseeable. In such a case, it can thus be said that foreseeability is a limitation on duty.

*Pulka v. Edelman*, 40 N.Y.2d 781, 785-86 (1976). Further, "the risk of injury as a result of defendant's conduct must not be merely possible, it must be natural or probable." *Pinero v. Rite Aid of N.Y., Inc.*, 743 N.Y.S.2d 21, 22 (App. Div. 1st Dep't), *aff'd*, 99 N.Y.2d 541 (2002). In other words,

> although virtually every untoward consequence can theoretically be foreseen with the wisdom born of the event, the law draws a line between remote possibilities and those that are reasonably foreseeable because [n]o person can be expected to guard against harm from events which are ... so unlikely to occur that the risk ... would commonly be disregarded.

*Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583 (1997) (alterations in original).

"A person breaches a duty of care owed to another if the person fails to exercise reasonable care under the circumstances in the discharge of that duty." *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 458 (S.D.N.Y. 2012); *see also Rambert v. United States*, No. 94-CV-1275 (JES) (RLE), 1996 WL 583392, at *3 (S.D.N.Y. Oct. 10, 1996) ("In New York, negligence is defined as conduct which falls below that of a reasonably prudent person under similar circumstances judged at the time of the conduct at issue.").

Finally, "[c]ausation incorporates at least two separate but related concepts: cause-in-fact and proximate cause." *Monahan v. Weichert*, 82 A.D.2d 102, 106 (N.Y. App. Div. 4th Dep't 1981). "Cause-in-fact refers to those antecedent events, acts or omissions which have so far contributed to the result that without them it would not have occurred." *Id.* "Proximate cause serves to limit, for legal or policy reason, the responsibility of an actor for the consequences of his conduct." *Id.* More specifically, proximate or legal causation is defined as that "which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred." *Rider v. Syracuse Rapid Transit Ry. Co.*, 171 N.Y. 139, 147 (1902). The Second Circuit has held that

> *14  [a]n injury or damage is proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

*Jund v. Town of Hempstead*, 941 F.2d 1271, 1286 (2d Cir. 1991).

Case 3:22-cr-00008-NKM-JCH Document 55-2 Filed 10/17/22 Page 13 of 18 Pageid#: 103

Wright v. United States, Not Reported in Fed. Supp. (2017)

B. Analysis

As a threshold matter, the parties do not dispute that Danielo owed a duty of care to Wright, and the Court agrees because an individual on supervised release—particularly one who is under electronic home confinement—"although not in the state's physical custody, is nonetheless in its legal custody, and his or her freedom of movement, while not as restricted as that of an incarcerated prisoner, is nonetheless somewhat curtailed." *Jacobs v. Ramirez*, 400 F.3d 105, 106 (2d Cir. 2005).

At trial, plaintiff argued that Danielo was negligent and breached the duty of care he owed Wright because Danielo (1) failed to review the second addendum to the PSR and notify the court that Wright was not a suitable candidate for electronic monitoring; (2) sized the ankle bracelet too loosely in contravention of the BI User Guide; (3) did not heed Wright's and Sprague's alleged pre-October 2010 complaints regarding irritation caused by the ankle bracelet; (4) did not remove the ankle bracelet on October 12, 2010 and did not inform the court or his supervisors of Wright's injury; and (5) failed to inquire about the status of Wright's health prior to October 16, 2010. However, for the reasons that follow, the Court disagrees with plaintiff and finds that Danielo was not negligent based upon the facts established at trial.

1. Placement of the Ankle Bracelet on Wright

With respect to plaintiff's first contention—that Danielo was negligent for failing to read the second addendum to the PSR and for not notifying the court that Wright was an unsuitable candidate for electronic monitoring—the Court finds that plaintiff did not carry her burden of proof.

First, Danielo testified at trial that he could not recall whether he had read, prior to April 13, 2010, the PSR addendum noting Wright's amputation; contrary to plaintiff's position, he did not affirmatively admit to never having reviewed that document. (Tr. at 502-07.) In any event, any purported failure to read the PSR addendum was not negligent given Wright's ability, during the home visit when the bracelet was installed, to advise Danielo of any medical issues or other circumstances that impacted the suitability of the ankle bracelet. In fact, even assuming that Danielo had a duty to read the PSR addendum and did not do so, the Court does not find that such an omission was the cause of Wright's injuries because Danielo saw and was aware of Wright's left-foot amputation before deciding to place the ankle bracelet on Wright's right leg. (*Id.* at 503-04, 507-08.) Thus, Danielo's purported failure to read the PSR addendum was not the "cause-in-fact" of any injuries that Wright sustained from the ankle bracelet.

Second, plaintiff has not proven that Danielo breached his duty to Wright by proceeding with the installation of the ankle bracelet or by failing to recommend a modification of the electronic monitoring sentence after observing Wright's amputation. As noted, the duty Danielo owed Wright under New York law extended only so far as to encompass "reasonably foreseeable harms." See *Qin Chen*, 494 Fed.Appx. at 109; *Pulka*, 40 N.Y.2d at 785-86. Although plaintiff " 'need not demonstrate ... that the precise manner in which the accident happened, or the extent of injuries, was foreseeable,' " plaintiff "must show that the defendant reasonably could have foreseen the danger against which the defendant allegedly failed to guard...." *Mays v. City of Middletown*, 895 N.Y.S.2d 179, 183 (App. Div. 2d Dep't 2010) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980)).

*15 Here, the evidence at trial did not establish that a skin ulceration was among the ankle bracelet-related dangers that Danielo could have reasonably foreseen. Although Thornton testified that it is "common knowledge" that (1) diabetics experience neuropathy and therefore "really can't feel pain," and (2) "what may be normal or not cause any type of rash or rub or damage on a person without diabetes could certainly cause an ulcer, rubbing, sore, and subsequently infection" to someone with diabetes (Tr. at 228-29), the Court does not find this conclusory opinion to be persuasive. [10] Plaintiff did not adduce any evidence to support this assertion, and Danielo credibly testified at trial that, over the course of his 19-year career, he had never received a complaint that an electronic ankle bracelet had caused an injury. (*Id.* at 440, 473.) Further, neither Wright nor anyone on his behalf argued

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 14 of 18   Pageid#: 104

Wright v. United States, Not Reported in Fed. Supp. (2017)

on or before April 13, 2010 that his medical condition precluded electronic home monitoring. (Tr. at 427-28.) For example, neither Wright nor his attorney objected to the electronic monitoring at the time of his sentencing. On the contrary, Wright signed, without objection, a Home Confinement Program Participant Agreement, which provided that "[w]hile in the home confinement program [Wright] agree[d] to wear a non-removal ankle bracelet that w[ould] be attached by [his] officer." (Tr. at 429-31; Wright Dep. Tr. at 49-50; DX K at 38; DX L at ¶ 8.) Likewise, Wright admitted that on April 13, 2010, he did not object to placement of the bracelet on his right ankle or complain that it was too tight or too loose.[11] (Wright Dep. Tr. at 58-60.) Accordingly, the Court cannot conclude that, as a matter of law, Danielo subjected Wright "to an unreasonable risk of harm arising from one or more *particular* foreseeable hazards" by fastening the ankle bracelet to Wright's right leg or by failing to request that the court modify its monitoring order. *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 584 (1997) (citing Restatement (Second), of Torts § 281, at 6).

In sum, the Court finds that plaintiff has not proven negligence based on Danielo's conduct on or before April 13, 2010.[12]

### 2. Sizing of the Ankle Bracelet

Plaintiff's next theory of negligence at trial was that Danielo violated his legal duty to Wright by sizing the ankle bracelet too loosely and using the "one-finger rule" to measure the distance between the bracelet and Wright's skin in lieu of the quarter-inch sizing prescribed by the BI User Guide. However, the Court concludes that plaintiff failed to prove by a preponderance of the evidence that Danielo "fail[ed] to exercise reasonable care under the circumstances." *Dilworth*, 914 F. Supp. 2d at 458.

First, there is insufficient evidence that the ankle bracelet was too loose on Wright's leg. As the BI User Guide makes clear, fastening the bracelet strap "a little loose" is impermissible because doing so "sends a false tamper message to the central monitoring computer. The transmitter has built-in sensors that detect whether or not it is properly placed against the client's ankle." (PX 3 at 78.) After placing the bracelet on Wright, Danielo received a "successful installation" confirmation from BI (PX 2 at 256), and, as Thornton acknowledged, there is no evidence that the bracelet ever sent a false tamper alert indicating that was there was too much space between Wright's skin and the device (Tr. at 299-300; *see also id.* at 468). Further, as noted, Wright did not complain to Danielo on April 13, 2010 about the sizing of the bracelet (Wright Dep. Tr. at 58-60), and, as discussed *infra*, Danielo did not received any indication prior to October 12, 2010 that the bracelet irritated Wright.

*16 Second, the Court finds that it was not unreasonable for Danielo to use the width of his finger to estimate the distance between the device and Wright's skin. As Thornton also acknowledged, experienced probation officers generally do not use rulers to determine appropriate sizing, and Danielo was trained to use the "one-finger rule," which he did without notable incident for more than a decade prior to Wright's injury. (*Id.* at 436-37.)[13]

Finally, even assuming that Wright was under a duty to strictly adhere to the quarter-inch sizing prescribed by the BI User Guide, the Court concludes that the skin ulceration that Wright sustained was not a "reasonably foreseeable" consequence of a loose ankle bracelet. *Qin Chen*, 494 Fed.Appx. at 109. The BI User Guide indicates that proper sizing of the bracelet is intended to prevent false tamper signals, and makes no reference to any medical issues that can result from a loosely fitting bracelet. That manual did not put Danielo on "actual or constructive notice" that improper sizing—namely, a looser bracelet—could result in the type of injury that Wright suffered. *Id.*

In sum, the Court does not agree with plaintiff that a reasonable standard of care required Danielo to precisely determine that the bracelet was a quarter-inch from Wright's skin before he fastened the device. Given all the evidence, including the evidence that Danielo successfully installed the bracelet (without prompting an alert) and that Wright did not register any objections, the Court finds that plaintiff has failed to carry her burden of proof on this issue.

### 3. Pre-October 12, 2010 Monitoring of Wright

Plaintiff has also failed to prove that Danielo was negligent in supervising Wright prior to October 12, 2010. Plaintiff argued at trial that Wright and Sprague complained to Danielo about discomfort caused by the bracelet in August or September 2010; however, as already noted, the Court did not find Wright's and Sprague's testimony on this matter to be credible.

First, Danielo credibly testified that, prior to October 12, 2010, neither Wright nor anyone on his behalf ever complained to Danielo about the ankle bracelet (Tr. at 446-448; 465-67), and there are no entries in Danielo's meticulous chronology reflecting any complaints (*id.* at 465; DX K at 23-40). In addition, although Sprague told Danielo on October 25 and November 1, 2010 that he had been aware of Wright's infection before October 12, 2010, Danielo denied that accusation. (Tr. at 481-84; DX K at 20-21.) Based on Danielo's detailed record-keeping practices and the Court's evaluation of the witnesses' testimony in light of all of the evidence, the Court finds Danielo's account to be credible. Conversely, the Court does not believe Wright's and Sprague's testimony that they told Danielo in August or September 2010 that the ankle bracelet was irritating Wright's skin and that Danielo refused to act. (Wright Dep. Tr. at 68-71; Tr. at 339-40.) That account is also at odds with Danielo's promise on October 12, 2010 to "do whatever [was] necessary in [Wright's] best interest medically...." (Tr. at 472, 474; DX K at 23.)

*17 Second, the record shows that on April 19, 2010, after the electronic ankle bracelet had been attached, Wright received leave to visit his podiatrist Dr. Furst, who did not contact Danielo to advise that it was improper or unsafe for Wright to wear an ankle bracelet. (Tr. at 152, 442; DX K at 35-36.) Similarly, from April to October 2010, there is no medical record indicating that Wright sought any treatment for injury caused by the ankle bracelet or that a doctor spoke to the Probation Department on Wright's behalf. (*Id.* at 152.) Wright also testified that he never sought medical treatment for irritation or injury caused by the ankle bracelet during this period, even after the bracelet allegedly began to chafe his skin in August 2010. (Wright Dep. Tr. at 63-70.) On the contrary, prior to October 12, 2010, Wright requested and received leave to, *inter alia*, attend his son's baseball games, visit his future sister-in-law, pick up prescriptions, grocery shop, run errands, and tend to another property of his in anticipation of a sale. (*Id.* at 441-62; DX K at 29-36.)

Finally, although Dr. Lucks's October 12, 2010 notes indicate that the irritation to Wright's skin began in August 2010, there is no evidence that Dr. Lucks reached that conclusion based upon his own independent medical evaluation; rather, it appears that this note may be based solely on what Wright reported to Dr. Lucks on that date. In any event, the notes do not indicate that Danielo was aware of this purported fact. (Tr. at 64; PX 6 at 77.) As stated *supra*, even assuming that Wright did experience pain caused by the ankle bracelet before Danielo's October 12, 2010 visit, there is no credible evidence in the record showing that Danielo was on notice of Wright's discomfort. In short, the Court concludes that plaintiff has not shown that Danielo was negligent in his supervision of Wright from April 13, 2010 to October 12, 2010.[14]

4. October 12, 2010 Visit

Plaintiff next contends that Danielo was negligent on October 12, 2010 because, after observing the cut on Wright's ankle, he (1) did not remove the ankle bracelet; (2) moved the bracelet up Wright's leg, tightened it, and told Wright to hold it in place using a band or sock; and (3) did not inform the court or his supervisors of Wright's injury. The Court disagrees.

First, the evidence shows that, on October 12, 2010, Wright's injury was not severe. Upon examining Wright, Dr. Lucks diagnosed an "ulceration" that was "stable," prescribed oral antibiotics, and sent Wright home. (Tr. at 73-75.) Plaintiff's own medical expert Dr. Harrington approved of that course of treatment based on Dr. Lucks's notes, testifying that there was no evidence of osteomyelitis, that Wright's leg was tender or swollen, that there was an infection going up his leg, or that there was a systemic problem. (*Id.* at 74-75, 169-70.) Accordingly, the Court finds that Danielo acted reasonably under the circumstances by permitting Wright to leave home confinement to seek treatment from a medical professional, instructing Wright to relay Dr. Lucks's course of treatment to Danielo, and telling Wright that he would act in his best medical interests. (*Id.* at 472-74; DX K at 23.)

*18 Second, the Court finds that Danielo did not act unreasonably in adjusting the ankle bracelet and that, in any event, there is insufficient evidence that his intervention was the cause-in-fact of Wright's subsequent osteomyelitis and associated injuries.

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 16 of 18   Pageid#: 106

Wright v. United States, Not Reported in Fed. Supp. (2017)

Danielo moved and tightened the ankle bracelet so that it would not further irritate Wright's wound pending the outcome of Wright's appointment with Dr. Lucks later that day; there is no evidence that Danielo intended for this alteration to be a permanent solution as opposed to a short-term, prophylactic measure. In addition, although Dr. Harrington opined that Danielo's decision to tighten the bracelet exacerbated Wright's injury (Tr. at 81-83), the Court finds that testimony to be hypothetical and that plaintiff has not "establish[ed], beyond the point of speculation and conjecture, a factual, causal connection between [her] losses and ... defendant's actions." *Aegis*, 737 F.3d at 179. Under New York law, a "defendant's conduct is not a cause-in-fact of an injury or loss if the injury or loss would have occurred regardless of the conduct," *id.*, and there is no liability for negligence "where there are several possible causes of injury, for one or more of which defendant is not responsible," *Bernstein v. City of N.Y.*, 69 N.Y.2d 1020, 1022 (1987). Here, the Court finds that there is insufficient proof that Danielo's adjustment to the bracelet, as opposed to an independent deterioration of the pre-existing infection, aggravated Wright's medical condition. That Dr. Lucks, a medical professional, did not recommend removal of the ankle bracelet or an alteration to the adjustment that Danielo made is further evidence that Danielo's intervention was not negligent.

Finally, Danielo's testimony also demonstrates that he was prepared to recommend modification of Wright's monitoring conditions to voice verification because he testified, and his chronology notes, that he reviewed the benefits and disadvantages of that monitoring method with Wright on October 12, 2010. (Tr. at 471; DX K at 23.) For the reasons stated above, the Court finds that Danielo acted reasonably in taking the actions that he did and in not immediately seeking such modification or notifying the court or his supervisors of Wright's injury on that day.

5. Post-October 12, 2010 Conduct

Plaintiff's final argument at trial was that Danielo was negligent in not contacting Wright prior to October 16, 2010 to inquire about his medical status. The Court again finds that plaintiff did not demonstrate by a preponderance of the evidence that Danielo acted unreasonably. As previously discussed, Danielo was awaiting further information from Wright, and neither Wright nor Dr. Lucks called Danielo before October 16, 2010 regarding Wright's injury. (Tr. at 478.) Instead, on October 15, 2010, Wright asked for and received permission to meet with his attorney on October 18 and with Dr. Lucks on October 19, 2010. (*Id.* at 479; DX K at 23.) In light of that request, which does not indicate that Wright's condition had worsened, and the fact that only a few days had passed following Wright's initial appointment on October 12, 2010, the Court does not find that reasonable care under the circumstances required Danielo to ascertain Wright's condition before October 16, 2010.

\* \* \*

As set forth above, the Court concludes that plaintiff has failed to prove all of the elements of his negligence claim by a preponderance of the evidence, and the Court therefore grants judgment to the government. "While one could argue, with the benefit of hindsight, that [Danielo] should have done things differently," *Qin Chen*, 494 Fed.Appx. at 110, the Court cannot conclude that a reasonable probation officer should have (1) foreseen that the ankle bracelet would injure Wright at the time it was placed on him when neither the BI User Guide nor the EDNY Manual described potential injury to diabetics; (2) used a precise quarter-inch sizing for the bracelet when Wright did not complain of discomfort and the manufacturer confirmed successful installation of the device, meaning that it was not inordinately loose on Wright's leg; (3) removed the ankle bracelet on October 12, 2010 based on a non-severe wound and before Wright was scheduled to seek medical treatment later that same day; or (4) contacted Wright prior to October 16, 2010 to check on his medical condition where Wright had seen his doctor only a few days prior, and had scheduled another appointment with his doctor and a meeting with his attorney without conveying any ongoing issues to the Probation Department. In addition, the Court finds that there is no credible evidence that Wright or anyone else ever complained to Danielo about the bracelet prior to October 12, 2010.

IV. CONCLUSION

Case 3:22-cr-00008-NKM-JCH Document 55-2 Filed 10/17/22 Page 17 of 18 Pageid#: 107

Wright v. United States, Not Reported in Fed. Supp. (2017)

*19  For the foregoing reasons, the Court concludes that plaintiff has failed to prove by a preponderance of the evidence that defendant was negligent. The Court therefore determines that defendant is not liable to plaintiff, and that plaintiff is not entitled to any damages. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3142041

**Footnotes**

| | |
|---|---|
| 1 | After Wright's death, the Court permitted the substitution of Alexis L. Wright, the administrator of Wright's estate, as the plaintiff in this action ("plaintiff"). |
| 2 | To the extent that any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law, and vice-versa. |
| 3 | "Tr." refers to the transcript of the bench trial held from December 19 through December 22, 2016. |
| 4 | "Wright Dep. Tr." refers to the transcript of the May 19, 2014 deposition of James A. Wright. |
| 5 | To the extent that the government failed to explicitly offer into evidence court records pertaining to Wright's criminal case during the bench trial, the Court will take judicial notice of them pursuant to Federal Rule of Evidence 201(b). See *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). |
| 6 | DX B was introduced into evidence as Defense Exhibit 1 to the Wright Deposition. (Tr. at 388.) |
| 7 | DX E was introduced into evidence as Defense Exhibit 3 to the Wright Deposition. (Tr. at 388.) |
| 8 | To the extent there was any suggestion that the entries were altered in any way after the fact to support Danielo's testimony, the Court finds no credible evidence to support that suggestion. |
| 9 | The Court notes that Sprague's testimony on this issue was far from consistent. For example, although testifying that the irritation began in August or September 2010, on cross-examination, she testified as follows: "Q. And isn't it [ ] true that the first time you knew there was a problem with the ankle was a few days before you went to see Dr. Lucks [on October 12, 2010]? A. Well, there was a problem basically the whole time—well, yes, yes. Q. So the first time you know there was a problem with the ankle was about four days before you saw Dr. Lucks, correct? A. Yes. Q. Which would be October 8th? A. Yes. Q. And you first realized the severity of the problem on October 12[th], right, correct? A. On or around that time. Q. And again you first noticed irritation about four days before seeing Dr. Lucks? A. Around—right, around that time—I can't commit to dates, I can't, around that time." (Tr. at 368-69.) |
| 10 | To the extent that plaintiff relies on Thornton's testimony that the federal "Bureau of Prisons recognizes [diabetes as a common illness] and has created a 50-page manual just addressing the issues of dealing with offenders that have the issue of diabetes and how they're to be treated" (*id.* at 269) to impute knowledge of diabetes-related complications to Danielo, there is no evidence in the record that (1) this manual discusses neuropathy or skin ulcerations to diabetics caused by wearing bracelets or similar items; or (2) Danielo, a former probation officer, ever read that document. |

Case 3:22-cr-00008-NKM-JCH   Document 55-2   Filed 10/17/22   Page 18 of 18   Pageid#: 108

Wright v. United States, Not Reported in Fed. Supp. (2017)

11  In fact, as discussed *infra*, even after Wright saw his podiatrist on April 19, 2010, no request was made to remove the bracelet. Thus, there is no credible evidence in the record to support the opinion that it was "common knowledge" that a diabetic should not wear an ankle bracelet for the reasons indicated by Thornton or Dr. Harrington.

12  Insofar as plaintiff challenges the Probation Department's Sentence Recommendation of electronic home confinement, quasi-judicial immunity precludes FTCA liability for negligence. *See Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 380-81 (E.D.N.Y. 2009) (noting that "the Second Circuit has granted quasi-judicial immunity to probation officers for preparing pre-sentence reports because, in preparing such reports, 'a federal probation officer acts as an arm of the court and that task is an integral part of one of the most critical phases of the judicial process.' " (quoting *Dorman v. Higgins*, 821 F.2d 133, 137 (1987))).

13  Although Danielo allowed his finger to be measured at trial and admitted that its width exceed a quarter-inch, that measurement was not precise, and the Court does not find that fact to be dispositive evidence that Danielo negligently installed the bracelet too loosely. (Tr. 512-15.) As noted above, even assuming that Danielo's "one-finger rule" resulted in a width that exceed a quarter-inch (or even the three-eighths of an inch recommendation in the EDNY Manual), it was not negligent for him to size the bracelet in this manner, especially given his utilization of that method for over a decade without incident.

14  Insofar as plaintiff argues that Danielo was negligent in failing to closely inspect Wright's leg during his September 9, 2010 home visit (Tr. at 241-45), there is no evidence that Danielo breached his duty of care. Danielo testified that his usual practice during such visits was to check the monitoring unit and electronic bracelet to ensure that they were functioning properly and were not tampered with, and to that end, Danielo would ask Wright to lift his pant leg so that he could see the ankle bracelet. (*Id.* at 448.) Even assuming *arguendo* that the skin on Wright's leg was visibly irritated on September 9, 2010 and that Danielo would have observed such irritation upon a close inspection of the ankle bracelet, the Court does not find that Danielo "fail[ed] to exercise reasonable care under the circumstances" by observing the bracelet at a distance. *Dilworth*, 914 F. Supp. at 458.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.